STATE of Minnesota, by its Attorney General Lori SWANSON, et al., Appellants (A12–1856),

Covington & Burling, LLP, Appellant (A12–1867),

City of Lake Elmo, Respondent,

Metropolitan Council, Respondent,

v.

3M COMPANY, Respondent.

Nos. A12–1856, A12–1867.

Supreme Court of Minnesota.

April 30, 2014.

Lori Swanson, Attorney General, Alan I. Gilbert, Solicitor General, Alethea M. Huyser, Assistant Attorney General, Beverly M. Conerton, Assistant Attorney General, Saint Paul, MN, for appellants State of Minnesota, et al.

John W. Lundquist, Kevin C. Riach, Fredrikson & Byron, P.A., Minneapolis, MN; and John K. Villa, Michael S. Sundermeyer, Joseph M. Terry, Williams & Connolly LLP, Washington, D.C., for appellant Covington & Burling, LLP.

Michael T. Nilan, Amanda M. Cialkowski, Peter Gray, Nilan Johnson Lewis P.A., Minneapolis, MN; Michael C. McCarthy, Maslon Edelman Borman & Brand, LLP, Minneapolis, MN; Delmar R. Ehrich, Faegre Baker Daniels LLP, Minneapolis, MN; and William A. Brewer III, Shain A. Khoshbin, Bickel & Brewer, Dallas, TX, for respondent 3M Company.

OPINION

WRIGHT, Justice.

This case presents several issues regarding disqualification of legal counsel because of a violation of Minn. R. Prof. Conduct 1.9(a) arising from a conflict of interest with a former client. These issues include who has standing to appeal a district court order granting a motion to disqualify, the legal standard for determining whether Rule 1.9(a) has been violated, and whether the right to seek disqualification can be waived. Appellant State of Minnesota retained appellant Covington & Burling, LLP (Covington) to represent it in a natural resource damages (NRD) case against respondent 3M Company involving the manufacture and disposal of perfluorochemicals (PFCs). Covington previously had represented 3M in legal and regulatory matters related to 3M's fluorochemicals (FC) business from 1992 to 2006. Covington first appeared on behalf of the State in this action in January 2011. In October 2012, the district court granted 3M's disqualification motion. Both the State and Covington appealed. The court of appeals dismissed Covington's appeal for lack of standing and affirmed the disqualification of Covington. We granted Covington's

and the State's respective petitions for review. For the reasons that follow, we affirm in part, reverse in part, and remand to the district court.

## I.

3M began manufacturing FC products for consumer and industrial uses in the 1950s. In the early 1990s, 3M sought FDA approval of two of its FC products for use in high-temperature food-packaging applications. In 1992, 3M engaged Covington attorney Peter Hutt for advice concerning the FDA petitions for FC-product approval. As 3M's FC business grew, 3M created what it called a "virtual law firm"—a team of both in-house and outside counsel—to advise 3M on regulatory, legal, and business issues related to its FC products. Hutt was a member of the team's regulatory group.

3M decided in 2000 to stop manufacturing FCs in the United States. However, Covington's representation of 3M on FC matters continued until 2006. In the course of representing 3M regarding the legal and regulatory issues related to the use of FCs in food-packaging applications, Covington attorneys obtained information from 3M addressing the health effects of exposure to FCs.

Since the end of Covington's representation of 3M on FC issues in 2006, 3M has entered into agreements with regulatory authorities to assist in remediation of PFC-related environmental pollution and to disclose information related to the health and environmental effects of PFCs.[1] In 2007, 3M reached an agreement with the Minnesota Pollution Control Agency (MPCA) that required 3M to assist in the

abatement of PFC pollution, disclose documents concerning the health and environmental effects of PFCs, and work with MPCA and the Minnesota Department of Health to develop health and toxicology studies related to PFCs. As part of that agreement, 3M was required to provide MPCA all documents, except those subject to attorney-client privilege or protection as attorney work product, related to "(1) the health or environmental effects of any PFC; (2) actions or precautions considered or recommended by 3M for managing, treating or disposing of wastes containing any PFC; and (3) any characteristic of any PFC or PFC waste that might cause the PFC or waste to be considered a hazardous substance or a hazardous waste."

In May 2010, 3M again engaged Covington. This engagement involved a retiree-benefits matter that was unrelated to 3M's FC business. Covington completed its work on the retiree-benefits matter on September 27, 2010. At Covington's request, 3M sent an e-mail formally terminating the engagement on the retiree-benefits matter on December 22, 2010, and Covington began representing the State against its former client less than two weeks later.

Covington also has a history of representing the State. Since 1995, Covington has represented the State in various environmental-litigation matters. Pertinent to the issues before us, on December 30, 2010, Covington agreed to represent the State in the NRD case against 3M. Covington and the State entered into a contingency-fee arrangement in which Covington agreed to assume all litigation costs and be reimbursed only in the event of a recovery.

In the NRD case, the State alleges that 3M's production of FCs polluted Minneso-

1. As the parties have defined the terms, perfluorochemicals (PFCs) are a subset of all

fluorochemicals (FCs), which are chemicals containing fluorinated organic compounds.

ta waters and injured natural resources. Covington first appeared as counsel for the State in January 2011. The parties began discovery, and as of November 8, 2012, the parties had produced more than six million pages of documents and deposed more than 70 witnesses. Between December 30, 2010, and October 11, 2012, Covington devoted more than 20,000 hours of attorney time to the NRD case and incurred between $2 million and $3 million in litigation expenses.

The deadline for completing fact discovery in the NRD case was June 1, 2012. On March 26, 2012, William Brewer III, outside counsel for 3M in the NRD case, sent a letter to Covington stating, "It has just come to our attention that Covington previously represented 3M for the purpose of providing 3M with legal advice concerning legal and regulatory issues associated with its fluorochemical business." 3M subsequently demanded that Covington withdraw. Covington refused.

Between the dates of Covington attorneys' first appearance in the NRD case and 3M's demand for Covington's withdrawal, then–3M General Counsel Marschall Smith twice indicated in communications with Covington attorneys that he was aware that Covington may have a conflict of interest in the NRD case. Smith exchanged e-mails with Covington attorney Daniel Spiegel on April 8, 2011. In these e-mails, Smith first indicated that he was aware Covington had taken an environmental case against 3M on a contingency basis. Although Spiegel initially replied that he was unaware of the environmental case, Spiegel sent a second e-mail confirming Covington's representation of the State in the NRD case. Spiegel explained that Covington had performed work for 3M before Smith's tenure but "the work

stream from 3M basically ended." Smith responded, "Sure, makes perfect sense ... you do have to represent your clients. Nothing personal. Hope we can get back to you after this is over." Seven months later, in a November 16, 2011 letter to Covington attorneys Mitchell Dolin and Benedict Lenhart, Smith wrote, "We did not raise the conflict issue when you filed the lawsuit on behalf of the State, but perhaps we should have." The November 2011 letter specifically referred to Covington's prior representation of 3M in insurance-coverage disputes and did not address Hutt's work for 3M related to the FC business.

On April 30, 2012, 3M moved to disqualify Covington as counsel for the State, alleging that Rule 1.9(a), Minn. R. Prof. Conduct, bars Covington from representing the State in the NRD case because the lawsuit is substantially related to Covington's prior representation of 3M regarding its FC business. While 3M's motion to disqualify Covington was pending, 3M brought a separate lawsuit against Covington in Ramsey County District Court for breach of fiduciary duty and breach of contract arising out of Covington's representation of the State in the NRD case. In that separate lawsuit, 3M alleges that Covington failed to protect client confidences, breached its duties of candor and full disclosure, and breached its duty of loyalty by taking a position materially adverse to 3M in the NRD case.

On October 11, 2012, the district court in the NRD case concluded that Covington violated Rule 1.9(a) and granted 3M's motion to disqualify Covington as counsel for the State. Because both the NRD case and Covington's prior representation of 3M regarding its FC business involve the potential health and environmental effects

of exposure to FCs, the district court found that Covington's prior representation of 3M regarding its FC business is substantially related to the NRD case. Having determined that Covington violated Rule 1.9(a), the district court concluded that the rule mandates disqualification. The district court also concluded that a client cannot impliedly waive the right to disqualify the opposing party's counsel based on a violation of Rule 1.9(a). The State and Covington each appealed the disqualification order, and their appeals subsequently were consolidated.

As a preliminary matter, the court of appeals granted 3M's motion to dismiss Covington's appeal, holding that Covington lacked standing because it has no legally protected right to continue representing the State. *State v. 3M Co.*, Nos. A12–1856, A12–1867, 2013 WL 3284285, at *3–4 (Minn.App. July 1, 2013). However, because the State also had appealed, the court of appeals reached the merits of the appeal and affirmed the district court's disqualification order. *Id.* at *4–6. The court of appeals concluded that Covington's representation of the State violated Rule 1.9(a) and that the language of the rule mandates disqualification. *Id.* at *6. In reaching this conclusion, the court of appeals rejected the argument that 3M had waived the right to seek Covington's disqualification by waiting until the end of discovery to raise the issue and rejected the argument that disqualification was discretionary based on equitable considerations. *Id.* The court of appeals observed that Rule 1.9(a) provides for informed consent but not waiver. *Id.*

We granted the State's and Covington's petitions for further review.

## II.

■ We first consider 3M's argument that Covington lacks standing to appeal its disqualification as counsel for the State. The court of appeals concluded that, because Covington is subject to discharge by the State at any time, Covington lacks a legally protected right that would give it standing to appeal. *Id.* at *3–4. We disagree.

■ Whether a disqualified attorney has standing—independent of the attorney's client—to appeal from a disqualification order is an issue of first impression for us. Standing is a jurisdictional issue, which we review de novo. *In re Custody of D.T.R.*, 796 N.W.2d 509, 512 (Minn. 2011). An appellant has standing to appeal if the appellant is an aggrieved party. *Id.* at 513. "The appellant's status as an aggrieved party depends on whether 'there is injury to a legally protected right.'" *Id.* (quoting *City of St. Paul v. LaClair*, 479 N.W.2d 369, 371 (Minn.1992)); *see also Singer v. Allied Factors, Inc.*, 216 Minn. 443, 446, 13 N.W.2d 378, 380 (1944) ("A party aggrieved is one whose personal right is injuriously affected by the adjudication.").

■ When our jurisprudence is undeveloped in an area, as it is here, we often consider case law from other jurisdictions for guidance. *Gordon v. Microsoft Corp.*, 645 N.W.2d 393, 402 n. 9 (Minn.2002). Among courts that have addressed whether an attorney may appeal his or her disqualification, most have concluded that an attorney may appeal a decision that the attorney committed professional misconduct, even if a monetary sanction or other punishment has not been imposed. *See, e.g., Adams v. Ford Motor Co.*, 653 F.3d 299, 305 (3d Cir.2011) (finding of attorney misconduct without formal reprimand or monetary penalty is an appealable sanction); *Keach v. Cnty. of Schenectady*, 593

F.3d 218, 225 (2d Cir.2010) ("[A] finding that an attorney is guilty of specific misconduct is an adverse decision that can be appealed, even if the court decides that no additional punishment needs to be levied."); *Butler v. Biocore Med. Techs., Inc.,* 348 F.3d 1163, 1168 (10th Cir.2003) (same); *United States v. Talao,* 222 F.3d 1133, 1138 (9th Cir.2000) (same); *Walker v. City of Mesquite,* 129 F.3d 831, 832–33 (5th Cir.1997) (same); *Briggs v. McWeeny,* 260 Conn. 296, 796 A.2d 516, 528–29 (2002) (finding standing to appeal disqualification). *But see Crews & Assocs., Inc. v. United States,* 458 F.3d 674, 677 (7th Cir. 2006) (observing that Seventh Circuit precedent does not permit an attorney to appeal from an order that finds misconduct but does not impose monetary liability, despite the potential reputational effects). In adopting this rule, courts have recognized that "the importance of an attorney's professional reputation, and the imperative to defend it when necessary, obviates the need for a finding of monetary liability or other punishment as a requisite for the appeal of a court order finding professional misconduct." *Walker,* 129 F.3d at 832–33. The rationale expressed by these courts is persuasive.

This majority rule also is consistent with our treatment of reputational interests in other contexts. In *Loftsgaarden v. Reiling,* 267 Minn. 181, 183, 126 N.W.2d 154, 155 (1964), for example, we concluded that a plaintiff could collect punitive damages for libel per se, even in the absence of actual damages, because professionals have an interest in safeguarding their reputations. *See also In re Estate of Overton,* 417 N.W.2d 653, 655–56 (Minn.App.1988) (allowing a doctor to appeal a probate court's invalidation of bequests to him based on a finding of undue influence because the damage to the doctor's professional reputation made him a "person aggrieved"). An attorney who is disqualified based on a finding that the attorney has committed professional misconduct likewise has a significant and distinct reputational interest at stake warranting defense and, therefore, should be permitted to appeal. Accordingly, an attorney has standing to appeal, independent of the attorney's client, when a district court finds that the attorney violated the rules of professional conduct and disqualifies the attorney from the representation.

The memorandum accompanying the district court's disqualification order at issue here includes a specific finding that Covington's representation of the State in the NRD case violated Rule 1.9: "Covington has not complied with [Rule] 1.9. Covington has exhibited a conscious disregard for its duties of confidentiality, candor, full disclosure, and loyalty to 3M by failing to raise its conflicts arising from the fact that it previously advised and represented 3M on FC matters." Under the rule we now adopt, Covington has standing to appeal the disqualification order.

### III.

We next address the district court's application of Rule 1.9(a), which provides,

A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.[2]

Minn. R. Prof. Conduct 1.9(a).

### A.

We first consider whether the district court properly disqualified Covington under Rule 1.9(a). We review the district court's decision regarding disqualification of counsel for an abuse of discretion. *See State v. Patterson*, 812 N.W.2d 106, 111 (Minn.2012). A district court abuses its discretion when it bases its decision on an erroneous view of the law or when it renders a decision that is contrary to the facts in the record. *City of N. Oaks v. Sarpal*, 797 N.W.2d 18, 24 (Minn.2011). In exercising its discretion, the district court should consider all legally relevant factors. *See State v. Freeman*, 531 N.W.2d 190, 198 (Minn.1995). Our ability to engage in effective appellate review of the exercise of that discretion depends on the presence of factual findings and legal analysis that sufficiently demonstrate that the district court considered all relevant factors. *See Stich v. Stich*, 435 N.W.2d 52, 53 (Minn.1989).

A party seeking disqualification of opposing counsel under Rule 1.9(a) must establish that (1) the moving party and opposing counsel had a prior attorney-client relationship, (2) the interests of opposing counsel's current client are materially adverse to the interests of the moving party, and (3) the present lawsuit is substantially related to a matter in which opposing counsel previously represented the moving party. Minn. R. Prof. Conduct 1.9(a). No party disputes that 3M and Covington had a prior attorney-client relationship or that the State's interests are materially adverse to 3M's interests in the NRD case. Therefore, under Rule 1.9(a), 3M need only demonstrate that the NRD case is substantially related to Covington's prior representation of 3M on FC-related matters.

Matters are "substantially related" within the meaning of Rule 1.9(a) "if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." Minn. R. Prof. Conduct 1.9 cmt. 3.[3] To assess whether two matters are substantially related, we analyze the extent to which the factual and legal issues in the two representations overlap and examine any other relevant circumstances.[4] *See State ex rel. McClanahan v.*

2. The Covington attorneys who are representing the State did not work on any PFC-related matter for 3M. But under Rule 1.10(a), "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule ... 1.9" unless certain circumstances not present here exist. Minn. R. Prof. Conduct 1.10(a).

3. Although the comments to the Minnesota Rules of Professional Conduct ordinarily are not binding on us, *see* Minn. R. Prof. Conduct, Scope cmt. 21, we recently used the standard articulated in comment 3 to decide whether

matters are substantially related within the meaning of Rule 1.9(a). *See Patterson*, 812 N.W.2d at 112; *see also Prod. Credit Ass'n. of Mankato v. Buckentin*, 410 N.W.2d 820, 823–24 (Minn.1987) (relying on a different comment to Rule 1.9 in determining if matters were substantially related). In light of our historical reliance on the comments to Rule 1.9 to interpret the meaning of the phrase "substantially related," we will consider those comments for guidance here as well.

4. To assert a Rule 1.9(a) violation, a former client is not required to disclose the confidential information purportedly supplied to the attorney. Instead, there is a rebuttable pre-

*Hamilton*, 189 W.Va. 290, 430 S.E.2d 569, 572–73 (1993) ("[U]nder Rule 1.9(a), determining whether an attorney's current representation involves a substantially related matter to that of a former client requires an analysis of the facts, circumstances, and legal issues of the two representations."). Two factors in addition to the relationship between the factual and legal issues are germane to the analysis—whether confidential information provided to the attorney in the prior representation subsequently has been disclosed to the public and whether that information has been rendered obsolete by the passage of time. Minn. R. Prof. Conduct 1.9 cmt. 3.

■ Here, the district court concluded, based on the evidence in the record, that Covington obtained confidential information in its prior representation of 3M, and the district court presumed that the information was shared with all Covington attorneys. But the district court did not meaningfully assess Covington's claims that this information was no longer confidential either because the information had been disclosed to regulatory authorities and the public or because 3M waived the attorney-client privilege by initiating a separate, concurrent lawsuit against Covington for breach of fiduciary duty and breach of contract. The district court also did not analyze whether there is a substantial risk that any remaining confidential information would materially advance the State's position in the NRD case. Therefore, the district court abused its discretion by failing to consider all legally relevant factors before concluding that the matters are substantially related. *See Freeman*, 531 N.W.2d at 198. Moreover, the district court's consideration of the

Rule 1.9(a) issue does not include sufficient factual findings or legal analysis to permit effective appellate review. *See Stich*, 435 N.W.2d at 53. Accordingly, we remand to the district court to evaluate the evidence using the proper legal standard discussed above. *See Krummenacher v. City of Minnetonka*, 783 N.W.2d 721, 733 (Minn. 2010) (remanding denial of variance application for consideration under the proper legal standard); *State v. Mauer*, 741 N.W.2d 107, 116 (Minn.2007) (remanding to district court after clarifying the legal standard because the district court was in the best position to review the record and apply the standard).

### B.

■ We next consider another issue of first impression—namely, whether a party can waive its right to seek disqualification of opposing counsel for a Rule 1.9(a) conflict. Under our waiver jurisprudence, any legal right may be waived, except as limited by public policy. *State ex rel. Shelby v. Rigg*, 255 Minn. 356, 365, 96 N.W.2d 886, 893 (1959).

Whether a party can waive the right to seek disqualification of opposing counsel for a Rule 1.9(a) conflict presents competing policy concerns. For example, the public's trust in attorneys and the judiciary requires that attorneys protect the confidences of their current and former clients. As the institution responsible for articulating and administering the standards of attorney conduct in this state, we must ensure that attorneys abide by our rules addressing conflicts of interest. The few courts that have declined to recognize waiver as a defense to disqualification have held that the need to "uphold[ ] high ethi-

sumption that the attorney obtained such information "as would normally have been ob-

tained in the prior representation." Minn. R. Prof. Conduct 1.9 cmt. 3.

cal standards in the legal profession far outweighs the problems caused by the delay in filing the disqualification motion." *Kevlik v. Goldstein,* 724 F.2d 844, 848 (1st Cir.1984); *see also, e.g., Emle Indus., Inc. v. Patentex, Inc.,* 478 F.2d 562, 574 (2d Cir.1973) (noting that, except perhaps in an "extreme case," a disqualification motion cannot be defeated because of a delay in bringing the motion).

This perspective is countered by the recognition that parties have a substantial right to the counsel of their choice, *see In re Estate of Janecek,* 610 N.W.2d 638, 642 (Minn.2000) (citing *Kerling v. G.W. Van Dusen & Co.,* 109 Minn. 481, 483–84, 124 N.W. 235, 235 (1910)), and the concern that disqualification motions are particularly susceptible to abuse as a litigation tactic. We do not countenance the strategic use of disqualification motions to delay judicial proceedings to gain an advantage in litigation. *See Cent. Milk Producers Coop. v. Sentry Food Stores, Inc.,* 573 F.2d 988, 992 (8th Cir.1978) ("This court will not allow a litigant to delay filing a motion to disqualify in order to use the motion later as a tool to deprive his opponent of counsel of his choice after substantial preparation of a case has been completed.").

We conclude that the right to seek disqualification of opposing counsel can be waived. Our conclusion is consistent with the majority of courts that have considered this issue.[5] Arguments to the contrary are unpersuasive. The policy considerations here differ materially from those rare cases in which we have invoked the public policy exception to our waiver doctrine. For example, in *Spann v. State,* we held that, after conviction, a defendant may not waive the right to appeal in exchange for a shorter sentence. 704 N.W.2d 486, 494–95 (Minn.2005). In reaching this conclusion, we reasoned that "retention of the right to appeal after a conviction is necessary both for the protection of the defendant's rights and maintaining the fairness of the judicial process." *Id.* at 494. A waiver of the right to appeal in that circumstance would have frustrated the role of the courts in overseeing the fairness of trials. *Id.* Permitting the defendant in *Spann* to waive the right to appeal would have removed any mechanism for reviewing the defendant's conviction. By contrast, permitting a party to waive the right to seek disqualification of opposing counsel in no way impairs our oversight of attorney conduct.

To be clear, our conclusion does not diminish an attorney's ethical obligations under Rule 1.9. The ethical obligations imposed on an attorney under Rule 1.9(a) apply regardless of whether a client waives the right to seek disqualification of opposing counsel for a conflict of interest under Rule 1.9(a). A district court's finding of waiver in the context of ongoing litigation will not preclude other remedies for violating Rule 1.9(a), including attorney disci-

---

5. *See, e.g., Cox v. Am. Cast Iron Pipe Co.,* 847 F.2d 725, 731 (11th Cir.1988) ("[W]aiver is appropriate where the former client, having every opportunity to do so, fails to object to a new relationship involving [its] former attorney." (citation omitted) (internal quotation marks omitted)); *Trust Corp. of Mont. v. Piper Aircraft Corp.,* 701 F.2d 85, 87 (9th Cir.1983) ("It is well settled that a former client who is entitled to object to an attorney representing an opposing party on the ground of conflict of interest but who knowingly refrains from asserting it promptly is deemed to have waived that right."); *Cent. Milk Producers Coop.,* 573 F.2d at 992; *Redd v. Shell Oil Co.,* 518 F.2d 311, 316 (10th Cir.1975) ("[W]e are not to be understood as condoning any conduct which appears in this record ... At the same time we reiterate that lawyer conflict of interest problems ought to be brought up long before the date of trial in an atmosphere which does not cast a shadow over the trial itself.").

plinary action or a separate lawsuit against the attorney for breach of fiduciary duty.

### C.

■■■■ Having concluded that the right to seek disqualification of opposing counsel can be waived, we next consider whether 3M waived that right in the NRD case. Waiver requires both knowledge of the right and intent to waive the right. *Valspar Refinish, Inc. v. Gaylord's Inc.*, 764 N.W.2d 359, 367 (Minn.2009); *see also Stephenson v. Martin*, 259 N.W.2d 467, 470 (Minn.1977). "[K]nowledge may be actual or constructive and the intent to waive may be inferred from conduct." *Valspar Refinish, Inc.*, 764 N.W.2d at 367 (citation omitted) (internal quotation marks omitted). The intent to waive, however, cannot be implied from mere inaction. *Frandsen v. Ford Motor Co.*, 801 N.W.2d 177, 182 (Minn.2011). Rather, the party asserting waiver must show that the waiving party knew of the right and intended to waive it. *Id.* Whether a party possessed an intent to waive is generally a question of fact that rarely should be inferred as a matter of law. *White v. City of Elk River*, 840 N.W.2d 43, 51 (Minn.2013).

■■■■ Several factors may be considered circumstantial evidence of an intent to waive the right to seek disqualification of opposing counsel, including but not limited to (1) the length of the delay in bringing the motion to disqualify, (2) whether the movant was represented by counsel during the delay, and (3) the reason for the delay. *See, e.g., Alexander v. Primerica Holdings, Inc.*, 822 F.Supp. 1099, 1115 (D.N.J.1993) (considering these factors, among others, in determining whether a party waived the right to seek disqualification of opposing counsel); *Commonwealth Ins. Co. v. Graphix Hot Line, Inc.*, 808 F.Supp. 1200, 1208 (E.D.Pa.1992) (same); *Emp'rs. Ins. of Wausau v. Albert D. Seeno Constr. Co.*, 692 F.Supp. 1150, 1165 (N.D.Cal.1988) (same). In addition, a court deciding a waiver claim should consider any relevant actions and statements by the party charged with waiver. *See Local 1142 v. United Elec., Radio & Mach. Workers of Am.*, 247 Minn. 71, 77, 76 N.W.2d 481, 484 (1956) ("To establish intent [to waive], relevant actions and statements of the individual concerned may be considered as having a direct bearing thereon....").

Because the State is the party asserting that 3M waived the right to seek Covington's disqualification, the State bears the burden of establishing that 3M knew of the right and intended to waive it. The district court did not conduct an implied-waiver analysis, but in rejecting the State's waiver argument, the district court discussed the dispute regarding when 3M became aware of the extent of Covington's prior representation of 3M. The district court's findings regarding the timing focus on the personal knowledge of then–3M General Counsel Smith. The district court found that Smith lacked actual knowledge of the potential conflict when the NRD case was filed. The district court also found that 3M's outside counsel, William Brewer, did not learn of the potential conflict until March 2012 and promptly sought Covington's disqualification thereafter. This analysis, however, is incomplete.

■■■■ To be legally relevant, the analysis must focus on the party to whom the right belongs. Because 3M is the party with the right to object to any conflict, the legally relevant point in time for determining the length of the delay in asserting the right to seek disqualification is when 3M is deemed to have learned of the conflict.

"[A] corporation is charged with constructive knowledge ... of all material facts of which its officer or agent ... acquires knowledge while acting in the course of employment within the scope of his or her authority." *Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 895–96 (Minn.2006) (citation omitted) (internal quotation marks omitted); *see also SCI Minn. Funeral Servs., Inc. v. Washburn–McReavy Funeral Corp.*, 795 N.W.2d 855, 866 (Minn.2011) (declining to reform contract for mutual mistake because, even though the person who negotiated the contract for SCI was unaware of the existence of certain property, someone at SCI was aware of the property, and that knowledge was imputed to the entire company). Here, in addition to whether and when Smith and Brewer acquired actual knowledge of the potential conflict, the inquiry must consider whether other 3M employees or agents, such as other 3M in-house counsel, already held knowledge that is relevant to determining when 3M learned of the potential conflict.

Because the district court concluded that implied waiver is not a defense to a disqualification motion under Rule 1.9(a), it did not undertake the necessarily fact-intensive waiver inquiry. *See White*, 840 N.W.2d at 51. Therefore, the district court's order does not contain sufficient factual findings to permit appellate review of appellants' claim that 3M waived its right to seek Covington's disqualification. Despite the voluminous record before us, we do not engage in the fact-finding that is necessary to resolve the waiver issue. *See Dunn v. Nat'l. Beverage Corp.*, 745 N.W.2d 549, 555 (Minn.2008) ("[A]ppellate courts may not sit as factfinders, and are not empowered to make or modify findings of fact." (citations omitted) (internal quotation marks omitted)); *Butch Levy Plumb-*

*ing & Heating, Inc. v. Sallblad*, 267 Minn. 283, 293, 126 N.W.2d 380, 387 (1964) ("It is not within the province of this court to make or amend findings of fact."). Instead, remand is required to permit the district court to make the necessary factual findings and determine whether 3M impliedly waived the right to seek disqualification of Covington.

## IV.

Finally, we consider the State's argument that, even if 3M did not waive the right to seek disqualification and Covington violated Rule 1.9(a), the district court was not required to disqualify Covington because the equities weigh against disqualification. In support of its argument, the State relies on the scope provisions of the Minnesota Rules of Professional Conduct, which provide that "violation of a rule does not necessarily warrant any other nondisciplinary remedy, such as disqualification of a lawyer in pending litigation." Minn. R. Prof. Conduct, Scope cmt. 20. The State's argument is without legal merit. The rules clearly direct that the text of the rules governs attorney conduct. Minn. R. Prof. Conduct, Scope cmt. 21 ("[T]he text of each rule is authoritative."). The text of Rule 1.9(a) provides that "[a] lawyer who has formerly represented a client in a matter *shall not* thereafter represent another person in the same or a substantially related matter...." Minn. R. Prof. Conduct 1.9(a) (emphasis added). It is this rule that governs.

In *Lennartson v. Anoka–Hennepin Independent School District No. 11*, we construed Minn. R. Prof. Conduct 1.10(b) and concluded that the rule, which is now phrased in mandatory language, no longer permits courts to weigh the equities to

determine whether disqualification should be imputed. 662 N.W.2d 125, 132–35 (Minn.2003). Although *Lennartson* addressed a different conflict-of-interest rule, the governing logic applies with equal force to Rule 1.9(a). Rule 1.9(a) similarly is phrased in mandatory language, and the text of the rule contains a standard for determining whether an attorney is disqualified from representing a particular client. As the rule dictates, a district court applying Rule 1.9(a) must apply the substantial relationship test. If the district court finds a violation of Rule 1.9(a), the offending attorney must be disqualified from the case, unless the moving party is otherwise barred—for example, by lack of standing, or by express or implied waiver—from seeking opposing counsel's disqualification.

## V.

Because we conclude that the district court did not consider legally relevant factors in conducting its disqualification analysis under Rule 1.9(a) and we conclude that a party can waive the right to seek disqualification of opposing counsel, we remand this case to the district court for its full consideration of these issues in a manner consistent with this opinion. The decision whether to reopen the record on remand rests within the discretion of the district court.

Affirmed in part, reversed in part, and remanded.

STRAS and LILLEHAUG, JJ., took no part in the consideration or decision of this case.